In the Matter of the Application of RICHARD OLIVER for a Writ of *Habeas Corpus* to discharge THOMAS OLIVER.

After the passage of the act of congress of March 3d, 1863, and the proclamation of the President of the 15th of September following, there was a valid suspension of the writ of *habeas corpus* in the cases therein defined.

The language of the act applies to the case of a person detained by the military authorities as a volunteer in the service of the United States.

APPLICATION for a Writ of *Habeas Corpus*.

*S. U. Pinney*, for the petitioner.

*By the Court*, PAINE, J. This is an application by a father for a writ of *habeas corpus* to procure the discharge of his son, a minor under eighteen, who is held as a recruit. To enlist such minors is in violation of the law of congress upon that subject; and the application is one in which, by the former decisions and practice of this court, the writ should issue, provided the privilege is not now suspended in a case like this.

A rule having been made and served upon the officer having custody of the recruit, to show cause why the writ should not issue, he answered claiming that under the act of congress approved March 3d, 1863, and the subsequent proclamation of

the President of September 15th, the privilege was suspended. Whether it is so or not is the single question now presented.

This court having already held in the *Kemp Case* (16 Wis., 359), that it was the function of the legislative and not of the executive department to suspend this privilege, the counsel for the petitioner now contends that congress, in the act referred to, instead of suspending it, only attempts to confer upon the President the power to do so. And this he claims to be void, as an attempt to delegate legislative power to the executive.

I confess that serious doubts have existed in my mind, whether the act is not obnoxious to this objection. The rule asserted by all courts is, that the judicial department should never declare an act void as unconstitutional, unless the conflict between it and the constitution is so clear as to admit of no doubt whatever. Yet I have never felt permitted under this rule to assume doubts, merely because an effort of the mind was required to discover the truth ; and, closing my eyes, say that the case was not clear, and thus suffer the constitution to be frittered away, as I think has been done too often. But on the other hand I would be equally free from seizing upon a general principle and applying it, without proper discrimination, to invalidate a law, if by any fair reasoning and honest interpretation it can be allowed to stand, or if, after exhausting these, a substantial doubt remains whether it ought to be held void.

There is perhaps no class of questions ever presented for judicial consideration, which involve more real difficulty, or leave greater room for the mind to remain in doubt, than those which involve the boundaries between that legislative power which cannot be delegated, and those discretionary powers which the legislature may entrust to other departments or persons in the execution of the laws. The field of such discretionary powers is too vast and too familiar to need references for illustration. It needs but a slight acquaintance with the

laws to understand that powers the most important are con-stantly entrusted by the legislature to the judgment of other departments, individuals, or corporate bodies, in relation to matters which the legislature undoubtedly might, if it saw fit, regulate or determine by the direct exercise of its own judg-ment. The power given to the judicial department to adopt rules of practice, having the force of laws, and the power giv-en to the President to prescribe rules and regulations for the draft, the validity of which was sustained by this court in the case of *Griner and others* (18 Wis., 423), present two perhaps as strong illustrations as any that could be mentioned. So that the position is very readily arrived at, that it does not fol-low from the fact that a matter *might* be regulated directly by the law, that it therefore *must* be.

In the investigation of this case we have found several re-cent authorities, not referred to in the *Griner* case, in which the general question is very ably discussed. There are some passages where the conclusion is so well stated that I shall quote from them at some length. In the case of *Slack vs. The M. & L. Railroad Co.*, 13 B. Mon., on page 23, the court says: "It is not essential to the character and force of a law, that the legislative enactment should itself command to be done everything for which it provides. The legislative power to command a particular thing to be done includes the power to authorize it to be done. The act done under authority con-ferred by the legislature, is precisely as legal and valid as if done in obedience to a legislative command. Each is entitled to the same force and efficacy, and each must be followed by all the consequences which, either by the general laws or by the particular statute, are annexed to the particular act, because each is done in effectuation of the legislative will, and each, when done according to that will, has all the sanction which the leg-islative power can give. Each is therefore entitled to the aid of the whole power of the government to uphold it, and to maintain the rights flowing from it. A peremptory statute is

at once mandatory and requires obedience, and thus is at once a perfect law in all respects. A statute giving authority to do or not to do, and prescribing the consequences of the act when done, has not, until the act is done, any mandatory effect requiring immediate obedience, except so far as it regulates the time and manner of doing the act, and expressly or impliedly commands that the agent shall not be prevented from doing it according to the discretion allowed. Beyond that it has not a mandatory effect until the act is done, and is not until then a perfect law as to all the purposes provided for. In other words, it does not take its final effect as a mandatory law, until the discretionary act is done, upon which it is to have its final and peremptory operation. So far as such a statute confers authority and discretion, it is as obligatory from the first as the legislative power can make it. And although its further practical efficacy may depend upon the discretionary act of some other body or individual, it is not derived from that discretion but from the will of the legislature which authorized the act and prescribed its consequences."

In *Burr vs. Blanding*, 14 Cal., 357, the court says: "Laws may be absolute, dependent upon no contingency, or they may be subject to such conditions as the legislature may impose. They may take effect only upon the happening of events which are future and uncertain; and, among others, the voluntary act of the parties upon whom they are designed to operate. They are not the less perfect and complete when passed by the legislature, though future and contingent events may determine whether or not they shall ever take effect. In anticipation of invasion or insurrection, or local disturbance, or other emergencies requiring the exercise of special powers, acts are constantly passed, and yet no one has ever questioned their validity as laws, because dependent in their operation upon occasions which may never arise." In *Moers vs. The City of Reading*, 21 Penn. St., 202, the court says: "Half the statutes on our books are in the alternative, depending on the

discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law."

So in *C. W. & Z. R. R. Co. vs. Commissioners of Clinton County*, 1 Ohio St., 88, it is said: "The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

I have come to the conclusion, though with some hesitation, that upon the doctrine of these cases the act of congress under consideration may be sustained. The ground of my doubt was this. Having held, with the other members of this court, that it required a legislative act to suspend the privilege of the writ, it seemed to me that the legislature must itself judge when the emergency had arrived which justified its suspension. I am still of that opinion. For notwithstanding the doctrine above quoted, there is still a boundary somewhere between those great essential acts of legislative judgment, the power to perform which cannot be delegated, and those discretionary powers which may be. The legislature could not, under the guise of enacting a conditional law, provide that whatever the President might thereafter enact or proclaim should have the force of law. The reasoning of those cases cannot and was not intended to be carried to any such length. And the power to determine whether the emergency has arrived, when, under the constitution, the privilege may be suspended, seems one of those essential trusts confided to the legislature which cannot be delegated. Starting from this position there is certainly ground for a very plausible argument, founded upon the language of the act of congress, to the effect that it is merely an attempt to transfer bodily to the President the en-

tire legislative function upon this subject. The first section provides, " that during the present rebellion the President of the United States, whenever in his judgment the public safety may require it, is authorized to suspend the privilege of the writ of *habeas corpus* in any case throughout the United States or any part thereof," &c.

Upon this language and that of the remainder of the section, which is of a similar character, I doubted whether the act could be sustained. But a law must not be judged by its artificial structure merely, but according to its substance and effect. And I have finally come to the conclusion that although this act professes to confer on the President authority to suspend the privilege of the writ, whenever in his judgment the public safety should require it during the present rebellion, yet that it is itself an expression of the legislative judgment that the time has already arrived when the public safety requires the legislature to provide for a suspension, and that it does provide for a suspension, not absolute, but to take effect according to the judgment of the President whether the authority conferred should be exercised in particular cases or not. Suppose that instead of being in its present form, this act had expressly declared that the public safety required provision to be made for a suspension of the privilege, and had then provided that during the present rebellion the writ should be suspended in all cases in which the President might elect to have himself and his subordinates relieved from the duty of obeying the writ. I think if such had been its form it could fairly have been sustained within the reasoning of the cases cited. The legislature would then have exercised its own function of determining that the emergency had arisen, requiring the privilege to be suspended and would have made general provision for it, leaving to the President, however, a discretionary power about using the authority conferred in particular cases. Such a power may be confided to him. And although the language of the act as it now is affords stronger ground for a

mere verbal argument that it was an attempt to transfer the entire legislative function to the executive, its real substance and effect are the same as they would have been in the form supposed. The law itself suspends the right in those cases where the President, in the exercise of the discretion conferred upon him, elects to have it suspended.

I think also that the language of the act is broad enough to include the case of a recruit, though not a prisoner, in its technical sense, charged with a criminal offense.

It is obvious that the public safety might require those in command of troops to be relieved from the necessity of obeying writs of *habeas corpus,* as well as those having custody of supposed offenders. It is for the legislature to determine the extent to which the suspension of the privilege shall be carried, and this act authorizes it " in any case," which includes all cases.

I think the application should be denied.