Church, J.
This was an action in the nature of a proceeding of quo warranto, brought to prevent the defendants from exercising certain duties as commissioners for selecting a site for the permanent seat of government, and erecting the capitol building of the territory of Dakota, under appointment of an act of the legislature of the territory, approved March 8, 1883.
The complaint alleges the appointment by the then Governor of the territory, February 11, 1862, of the city of Yankton as the place for the first meeting of the legislative assembly; the meeting of the legislative assembly at the time and place so appointed; the location and establishment by said Governor and legislative assem *386 bly of the seat of government at Yankton by act approved April 8, 1862; that Yankton has ever since been the lawful seat of government; that all sessions of the legislative assembly have been held there; the territorial offices held thereat; and all the public books, records, and archives kept there; and that' said seat of government has never since been changed by the Governor and legislative assembly, as provided by the Organic Act. The complaint then alleges the appointment of the defendants as commissioners for the purposes above mentioned “ under and by virtue of a pretended act of the legislative assembly of the territory of Dakota, * * * approved March 8, 1883, which said appointments were and are in violation of said act organizing the territory of Dakota.”
It further alleges that the defendants, as a pretended board, under said pretended act, have usurped said office of commissioners, and the right, privilege, and franchise of naming the seat of government, and are proceeding to change and permanently locate the capital and seat of government at some place other than the city of Tankton, in violation of law and the Organic Act. After some further allegations, not material to the present inquiry, judgment is demanded that defendants are not entitled to said office, and that they be ousted therefrom, and that the said pretended act, and all acts done or performed by said commissioners, be declared illegal and void.
The answer of the defendants, admitting the facts to be substantially as charged in the complaint, avers their due qualification as commissioners by giving bonds and taking the oath as prescribed in the act of 1883, and insists upon the validity of said act, and the regularity of all their proceedings thereunder. ,
It being considered by the court that no material issue of fact was raised, the cause was heard upon motions by both parties for judgment upon the pleadings. The motion of the plaintiffs pre *387 vailed, and on August 27, 1883, judgment was given “that said “ defendants and each of ,them be, and they are hereby forever ousted ■“ and excluded from said office of commissioners mentioned in said “ act in the complaint described, and from all franchises and privi- *< leges named, enumerated, or included therein.” From that judgment.this appeal is taken.
Passing by as not necessary to be considered, certain questions of practice raised by the appellants, the errors assigned are the refusal of defendants’ motion for judgment, the granting of plaintiff’s motion, and the judgment rendered thereupon.
The provisions of the act, quoted in full so far as necessary to the proper consideration of this case, are as follows:
“ Section 1. The seat of government of the territory of Dakota “ is hereby removed from the city of Yankton, in the county of “ Yankton and territory of Dakota, and is located and established “ as hereinafter provided.”
“ Sec. 2. That Milo ~W. Scott, Burleigh F. Spaulding, Alex- “ ander McKenzie, Charles H. Myers, George A. Matthews, Alex- “ ander Hughes, Henry H. DeLong, John P. Belding, M. D. “ Thompson, be and they are hereby appointed commissioners for “ the purpose of locating the permanent seat of government and “ the capitol building of the territory of Dakota.”
Section 3 provides for the qualification of the commissioners by giving bonds in the sum of $40,000 each, and the taking of the customary oath, their organization by the election of president, secretary, and treasurer, and the giving of a bond by the latter in the sum of $100,000.
“ See. 4. On or before the first day of July, A. D. 1883, the “ commissioners, or a majority of them, shall select a suitable site “ for the seat of government of the territory of Dakota, due regard “ being had to its accessibility from all portions of the territory, *388 “ and its general fitness for a capital, when at least one hundred “ thousand dollars ($100,000) shall be paid or guaranteed in “ money; if the amount be not paid in money, then its payment “ to the territory shall be secured by a bond, with good and suffi- “ cient sureties, payable to the territory, which bond shall be ap- “ proved by said commissioners, or a majority thereof,, and after “ the site is determined upon as aforesaid, said commissioners shall “ secure good and sufficient title deeds of at least one hundred and, “• sixty acres of land, upon which the capitol buildings shall be “ erected, and a sufficient amount of said grounds shall be laid out “ into squares and suitable landscapes, and the same is hereby de- “ dared to be the permanent seat of government of the territory “ of Dakota, at which all of the public offices of the territory shall “ be kept, and at which all of the sessions of the legislature shall “ hereafter be held.”
Sections 5, 6, and 7, provide for the laying off into lots, blocks, streets, alleys, and public squares, and for sale and conveyance of the residue of the lands not occupied by the capitol buildings and improvements.
“ Sec. 8. All moneys received by the commissioners for the “ sale of lots shall be forthwith deposited by them in the territorial “ treasury, and said money shall be held by 'the treasurer as a terri- “ torial building fund, and shall be kept by him separate from “ other funds and be separately accounted for.”
Section 9 provides for the expenses of the commissioners, and for their compensation at the rate of six dollars for each day actually employed, (such compensation not to exceed in the aggregate $10,000,) all to be paid out of the territorial building fund. Sections 10, 11, and 12, provide for the erection of the necessary buildings; section 12 concluding as follows: “ As soon as the cap- “ itol building, provided for in this act, is erected and completed, *389 it shall he the duty of said commissioners to report such facts to “ the Governor, who shall thereupon issue his proclamation setting “ forth the action of the commissioners, and declaring said build- “ ing ready for occupancy. And it shall then be the duty of all “ the territorial officers, whose offices are properly kept at the cap- “ itol, to remove, within thirty (30) days thereafter, their several “ offices, together with the public property, archives, records, books, “ and papers to the building and place so declared ready for occu- “ pancy, and all sessions of the legislature shall thereafter be con- “ vened in the said building at the said place.”
“ Sec. 13. The title to all lands secured by the commissioners “ for the location and erection of capitol buildings shall be con- “ veyed to the territory of Dakota.”
Section 14 requires the commissioners to make a full and complete report of all their doings to the next legislature, declares that they and their sureties shall be held responsible on their bonds for-all their acts until the legislature shall order the bonds delivered up to them, and prohibits them from purchasing or acquiring any. interest in any real estate, within 10 miles of the site selected, within one year from the passage of the act, and from being interested in any contract made under the provisions of the act.
Section 15 prescribes penalties for violation of the foregoing section.
“ Sec. 16. Until the territorial capitol buildings shall be ready “ for occupancy as provided by this act, the territorial officers shall “ temporarily keep their offices, archives, books, records, and “ papers at the city of Yankton, unless the Governor shall desig- “ nate some other place by written order, in which case the said “ officers shall remove their respective offices, together with the “ archives, books, records, and papers pertaining thereto, to the “ place so designated within the time prescribed in such order.”
*390 “ Sec. 17. Chapter 1, of the Political Code, and all acts or “ parts of acts in any manner in conflict with this act or repugnant “ thereto, are hereby repealed.”
<£ Sec. 18. This act shall take effect and be in force from and after its passage and approval.”
We are not informed by anything in the records, or by any written opinion of the learned Chief Justice before whom the case was tried, of the grormds upon which the j udgment of the District Court was based; but the principal reasons urged in-this court in support of that judgment are:
First. — That the act of 1883 is in conflict with those provisions of the Organic Act of the territory, under and in pursuance of which alone the power to change the seat of government can be exercised, in that it delegates to these defendants the duty of selecting a suitable site for the location of the seat of government,— a duty which, it is claimed, could be lawfully performed by the Governor and legislative assembly only.
Second. — That said act is also in conflict with the Organic Act, in that it appoints these defendants by name as commissioners, whereas, if any lawful appointment could be made for the purposes indicated, such appointment should have been made by the Governor, by and with the advice and consent of the legislative council, upon the Governor’s nomination.
These are the questions, therefore, which are presented for our consideration, — questions whose just determination is to be sought in the line of established principles of legal interpretation and construction, guided only by the purpose to ascertain and declare the law.
The first inquiry which suggests itself is as to the nature and extent of the general powers conferred upon the territorial legis- *391 ¡ature by the Organic Act, since upon this foundation rests whatever claim to validity may be possessed by the act in question.
We shall not attempt to follow counsel in their interesting discussion of the various theories of ultimate sovereignty, and the sources and nature of the power of the Federal and State legislatures. We shall limit ourselves to as brief an expression of our views as may be consistent with an intelligent statement of the reasons which have led the court to its judgment.
We think it must be regarded as a settled principle of constitutional interpretation in this country, that the people are the sovereigns, and that in the people resides ultimate sovereignty.
If we consider the several State organizations, it is evident that' the legislature is not the State, nor is the judiciary, nor the executive, nor are all combined, the State. The people organized into a political society are the State, and the various departments mentioned are but the machinery through which the popular will finds expression, interpretation, and execution. To these several departments the people have committed — nr, in other words, delegated— the exercise of the various powers and duties appropriate to each, and as limitations thereupon have formulated and adopted those organic instruments which we call constitutions; and the power that thus created, conferred, and limited, may, within certain limitations, alter, amend, and even abrogate. -And it is to be observed that these limitations last referred to are either self-imposed, or such as inhere in the very nature and constitution of human society; they are never imposed upon the people by any of the departments of the State government, nor can they be. The servant cannot control the master.
Nor does it militate against this view to suggest, as do respondents’ counsel, that no body of the people, however numerous, even though comprising all the citizens of a State, would have any more *392 ..right to violate a law than would any one citizen; since it is not in the people as a mere aggregation of individuals, but in the people as an organized political society, which is, in contemplation of law, a voluntary association, that the sovereignty resides; and the •sovereign will having been expressed ip its appointed way, one and all are equally bound to obey it; and, in the terse language of the accomplished author of the Letters of Junius, “ the submis- “ sion of a free people to the executive authority of government is “ no more than a compliance with laws which they themselves “ have enacted.”
Passing now to the Federal government, we find here a like commission or delegation of power from the sovereign, to-wit: the people; only here it is the people of the United States who are sovereign. The language of the preamble to the constitution is: “ We, the people of the United States.” Here, too, we have the three departments of government framed for the expression, interpretation, and execution of the sovereign will, to each of which have been committed or delegated its appropriate powers. And here, also, we find an Organic Act or instrument, called a constitution, containing within itself an expression of the conditions and methods, self-imposed by the sovereign, under and in accordance with which it may be altered or amended. This is sometimes spoken of as a surrender of power by the people to the general government; but ean it be so regarded? The only true view of our system of government, both State and National, is that which regards the people as still sovereign, and every lawful act of every department of any of these governments, State or National, as but the will of the sovereign, expressed by and through their chosen instruments.
It may, perhaps, be conceded that there is this difference between the State and the Federal constitutions: that while the former are *393 to be regarded as limitations upon tbe general powers of the State government, the latter is to be searched for the grant of any power claimed on behalf of the National government: (Cooley, Const. Lim., 173;) although, in such a search, it should always be remembered that there is “ a vast domain ” of implied powers,— powers necessary for the effectuation of those specifically granted. By the ordination of that instrument the federal Union was formed; and in it, either expressly declared or necessarily implied, is to be found every power delegated by the people to the general government. We should hardly have thought it necessary to cite any proof of the proposition that the powers possessed by the several departments of the federal government are, in a broad and general sense, delegated powers, had not counsel for the respondents so earnestly insisted upon a contrary view.
The preamble to the constitution recites the sovereign purpose. The first section of article 1 declares that “all legislative powers herein granted shall be vested in a Congress of the United States.” The eighth section of the same article prescribes what this Congress shall have power to do. And article X of the amendments declares that “ the powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.”
Among the powers conferred upon the general government in its various departments are those of declaring war and making treaties. Implied in these powers is that of acquiring territory by conquest or purchase; and a necessary consequence of such implied power would seem to be the power to dispose of and make all needful rules and regulations respecting the territory so acquired. This latter power, however, has been expressly conferred upon the Congress by section 3, of article IY, of the constitution. From whatever source derived, the possession by Congress of the *394 power of governing the territory of the United States is unquestioned, (Amer. Ins. Co. v. Canter, 1 Pet., 542;) and this power is complete and absolute. “ Congress is supreme, and, for the “ purposes of this department of its governmental authority, has “ all the powers of the people of the United States, except such as “ have been expressly or by implication reserved in the prohibi- “ tions of the constitution. * * * It has full and complete legislative authority over the people of territories and all the departments of the territorial governments Nat. Bank v. Yankton Co., 101 U. S., 132.
It is manifest, also, from the considerations already advanced, that this power, like all others possessed by Congress, is a delegated one. In the language of the.opinion just cited, “ Congress * * * has all. the powers of the people of the United States ” in the matter. If, therefore, the maxim, delegatus non potest delegare, invoked by respondent’s counsel, be applicable, it may appear .somewhat strange that, instead of any question as to the power of Congress to legislate for the territories, there has never been raised the question whether such delegated power could be redelegated; in other words, whether it could be lawfully exercised in any other way than by the enactment by Congress of a system of laws complete in all details of government for the territories. For, beginning with the ordinance of 1787, the practice of Congress has been to establish in all the territories complete systems of local self-government similar in all essential respects to those of the States of the Union, and to commit to the various departments of these local governments the exercise of all the functions appropriate to each, reserving either expressly, as in some instances, or impliedly, as in others, a supervisory and revisory power over all territorial legislation.
It would be a vain task for this court or any other court to *395 assail this long-established policy, on the ground that it is an unlawful delegation of delegated power. Rather should we seek for some solution of the question which shall be in harmony with those broad principles upon which rests the fabric of the republic. Such a solution, we believe, may be found embraced in or closely associated with the great underlying principle of local self-government. It was never the intention of the framers of our federal Union that any portion of the public domain should forever continue to be “ but political subdivisions of the outlying dominion of the United States,” bearing a relation to the general government “ much the same as that which counties bear to the respective States.” Nor do we think that the above language, quoted from the opinion of the Supreme Court of the United States in the case of National Bank v. Yankton Co., before cited, is to be extended beyond its original purpose.
The principal questions under consideration in that case were as to the power of Congress to legislate specifically for the territories, and the effect to be given to such legislation, and to those questions the language quoted was apt and pertinent. But it is unnecessary to presume that that language was intended by the court as an accurate judicial definition of the political- status of the territories applicable to all cases. Such a proposition would not command the assent of any diligent student of constitutional law, and we think no such construction can be placed upon that opinion.
The controlling basilar idea of our republic is that of an organic union of republican States; a noble building “ fitly joined together, and compacted with that which every joint supplieth.” The ultimate purpose is that every portion of its territory shall, as soon as practicable, be organized into States which shall take their equal place and part in the Union. The territorial condition is but a necessary incident of immaturity. Every essential element of *396 statehood is there, and the policy of the government has always been to employ this period as one of preparation by clothing the territories with the paraphernalia and investing them with many of the duties and privileges of statehood.
Let us see what has been done in this respect. The ordinance of 1787 for the government of the northwestern territory has been already alluded to, and although that was enacted prior to the adoption of the constitution and is not now in force, (Strader v. Graham, 10 How., 82,) the general policy of Congress in reference to the government of the territories has remained as therein expressed. "We do not wish to be understood as affirming any right in the inhabitants of any particular portion of the public domain to demand admission into the Union as a State. The hand that created can destroy, and the boundaries of any territory may be entirely altered by Congress at its pleasure. "We are merely stating what we understand to have been the general policy of the government.
The acts under which the several territories have been from time to time organized, are all drawn after the same general pattern, and are in all essential particulars similar. That organizing this territory was passed March 2, 1861: 12 Statutes at Large, 239. Its title is: “An act to provide a temporary government for the territory of Dakota, and to create the office of surveyor general therein.” The first declaration of the act is, that the territory therein described “ is hereby organized into a temporary government by the name of the territory of Dakota.” Section 2 vests the'executive power in a governor, and prescribes in very general terms his powers and duties, among which we note here, for future reference, that “ he shall approve all laws passed by the legislative assembly before they shall take effect.” Section 4c vests “ the legislative power and authority of said territory in *397 the Governor and legislative assembly,” and provides for the election and constitution of the latter. Section 6 declares that “ the legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution and the provisions of this act;” but prohibits any legislation interfering with the primary disposal of the soil, taxing property of the United States, taxing property of non-residents higher than that of residents, impairing private property, or making any discrimination in taxing different kinds of property. Section 9 vests the judicial power of the territory in certain courts therein mentioned, and prescribes in general terms their jurisdiction. Section 13 provides for the election of a delegate to the House of Representatives of the United States. Other sections provide for the appointment of various officers, and sundry other matters not necessary to be mentioned in this connection.
Here, it will be observed, is no code of laws, civil or penal. This Organic Act is, in all its essential generic features, similar to-the constitutions of the several States, and there can be no doubt that it was designed to serve a similar purpose, (Ferris v. Higley, 20 Wall., 375, 380;) the power to amend, alter, or repeal, however, remaining in Congress, which may exercise such power in a summary way, either directly or indirectly, by adyerse legislation.
If the provisions of the Organic Act pertaining to legislation are to be regarded as a mere delegation to the territorial legislature of the law-making power, ample and complete as it is, and extending as it does, in general terms, to all rightful subjects of legislation, they might seem obnoxious to the well-settled rule that powers strictly and exclusively legislative cannot be delegated: Cooley, Const. Lim., 116; Wayman v. Southard, 10 Wheat., 1. But such a view of the Organic Act is manifestly a too narrow one. The same author just quoted, referring to the rule that legislatures cannot delegate the power to make laws, says, (5th Ed. p. *398 228:) “ But fundamental as this maxim is, it is so qualified by the customs of our race, and by other maxims, * * * that the right to create towns and counties, * * * and to confer upon them the powers of local government, * * # would always pass unchallenged. The legislature, in these cases, is not regarded as delegating its authority, because the regulation of such local affairs is not understood to belong properly to the State.” And yet it must be admitted that the State may regulate them by direct legislation.
"We have quoted these words of this learned author merely for the purpose of showing that not every creation by the legislature of subordinate legislative bodies is to be regarded as a delegation of law-making power, although, for reasons already stated, we think that the analogy between the relations borne by counties and other municipal organizations to the State legislatures and those borne by the territory to the Congress of the United States is by no means complete. There is a wide and, as it seems to us, an essential difference in the conditions and purposes of their existence. The relations between the territories and the general government may indeed be said to be sui generis, having no complete analogy in any other political organizations.
So, then, we must either boldly affirm that the whole scheme of territorial government is unlawful, and that the established policy of Congress in this regard is an abdication of the trust committed to it by the people; or, taking a broader and more comprehensive view, we shall conclude that the power reposed in Congress to make needful rules and regulations for the government of the territories comes fairly within the scope of those administrative functions of legislative bodies which it is generally conceded they may either exercise themselves in detail or by statutes containing general provisions only, and that in erecting within the prospective *399 State the full machinery of a State government, with all its departments, Congress has discharged to that extent the trust reposed in it in a mode which was not only demanded by the exigencies of the situation, but which is also in entire harmony with our republican system of government.
And since the investiture of the territorial legislature with leg- ' islative powers is, as we have seen, general in its terms, extending to all rightful subjects of legislation, we think this is to be regarded as a delegation of authority in the same general sense only in which the powers of Congress are considered to be delegated to it by the people, and that such powers are, within their proper scope, to be exercised in the same manner as like powers may be exercised by other legislative bodies, state and national.
Sanction for the views thus expressed will be found in several decisions of the Supreme Court of the United States. In the case of Miners’ Bank v. Iowa, 12 How., l,the court says: “ By what “ may be termed the Organic laws, creating the governments of “ both the territories above mentioned, it will be seen that those “ governments were vested with general legislative power, and “ were subjected to no enumerated or specific limitations of that “ general power, save in certain exceptions relating to the lands or “ other property of the United States,” etc.
Language of like import was employed by the court in the case of Trustees of Vincennes University v. Indiana, 14 How., 273.
Again, in the case of Clinton v. Englebrecht, 13 Wall., 434, the court says, (p. 441:) “ The theory upon which the various govern- “ ments for portions of the territory of the United States have “ been organized has ever been that of leaving to the inhabitants “ all the powers of self-government consistent with the supremacy “ and supervision of national authority, and with certain funda- “ mental principles established by Congress.” And after referring *400 to the Ordinance of 1784, and the fact that this was superseded by that of 1787, already referred to, the court further say: “ This “ legislature (provided for by the Ordinance) * * * was “ clothed with the full power of legislation for the territory:” Page 442. And again, on page 443: “ In all the territories full u power was given to the legislatures over all ordinary subjects of “ legislation. The terms in which it was granted were various, “ but the import was the same in all.”
So, also, in the case of Hornbuckle v. Toombs, 18 Wall., 648, the court says, (p. 655:) “ As a general thing, subject to the general scheme of local government chalked out by the Organic Act “ and such special provisions as are contained therein, the local “ legislature has been intrusted with the enactment of the entire “ system of municipal law; subject also, however, to the right of “ Congress to revise, alter, and revoke at its discretion. The pow- “ ers thus exercised by the territorial legislature are nearly as ex- “ tensive as those exercised by any State legislature.” See, also, Ferris v. Higley, supra. We might add that in the District of Columbia, over which, by the express terms of the constitution, (article 1, Sec. 8,) the power to exercise exclusive “ legislation in all cases whatever ” is given to Congress, Congress at one time provided a Governor and legislature, and a complete system of government: Revised Statutes relating to District of Columbia, pages 1 to 149.
Having thus defined the relation of the territory to the general government, and the general powers of the territorial legislature under the Organic act, the next inquiry which presents itself is, what provision is made in the Organic Act for a change of the location of the seat of government of the territory? Section 12 of that act, is as follows: “ That the legislative assembly of the terri- “ tory of Dakota shall hold'its first session at such time and place *401 •“ in said territory as the Governor thereof shall appoint and direct, “ and at said first session, or as soon thereafter as they shall deem “ expedient, the Governor and legislative assembly shall proceed “ to locate and establish the seat of government for said territory •“ at such place as they may deem eligible; which place, however, u shall thereafter be subjeet to be changed by the said Governor “ and legislative assembly.”
It is contended by counsel for respondents that in this section • alone is to be found the power to change the location of the seat of government, and that such power is a special trust conferred upon and reposed in -the Governor and legislative assembly, by which they are charged with the duty of personal selection of a new location. In support of this view it is insisted by counsel for respondents that the words, “ as they may deem eligible,” contained in the section just quoted, not only impose upon the Governor and legislative assembly the personal duty of determining the eligibility of the place at which the seat of government was to be first located, but that these words are to be transferred, and relate with like force to the last clause of the section, which contemplates a subsequent change or changes.
It would be a sufficient answer to this contention to say that the section referred to was long since superseded by section 1944 of the Revised Statutes, in which these words are not found; but, inasmuch as what we regard as the only provision of the original section pertinent to the circumstances is preserved in the present . act, it will be convenient to take a general view of both.
In the first place, let us see to what a result such a construction as that contended for would lead us. This territory is, in round numbers, some 400 miles square, with a population said to be nearly 350,000, distributed over a great portion of its surface. A number of important and growing towns were contending for the *402 honor and profit attaching to the seat of government —each, no-doubt, deeming itself to possess peculiar advantages. By the organic law the legislature meets biennially, and its sessions are limited to 60 days. The facilities for ready transportation in the territory are limited. Manifestly, it would be impossible for a legislative assembly convened from so large a territory for so short a period, and in the midst of many other pressing duties, to make intelligent choice of a location for the seat of government. But it is suggested that a committee of the legislature might be appointed to examine and report. To examine, when? During the 60 days’ session,-or so much as might remain after their appointment 2 Meantime, during their absence upon this duty, what is to be done with general legislation? How are the constituencies of these committee men to be represented in the legislature? Or, if their examination is to be made after the adjournment of the legislature, to whom are they to make their report? To the next legislature? That would not be the body that appointed them; they would probably not be members of the new body, and, if they should, it would be by virtue of a new election; and, even if the report of such a committee to such new legislature could have any possible value, or be received and adopted by legislative act, at least four years would intervene between the initiation of steps to change the seat of government and the time when a new location could be made available for a session of the legislature. But we do not think the act will bear any such construction. Certainly none such is necessary. The argument of tbe learned counsel strikes us as more ingenious than forcible. Ve have already noticed that it was not wholly pertinent.
In order to ascertain the powers and duties.of the legislature in this respect we must look, not alone to any isolated section of the Organic Act, but to every part of it, considering its whole scope and purpose. We have already seen that the purpose of that act, *403 as declared in its title, is not to govern, but “ to provide ” a temporary government for the territory. We have also seen that the legislative power in the territory is vested in the “ Governor and a legislative assembly,” and that such legislative power is a general one, extending to all rightful subjects of legislation. We have heretofore noted the fact that, by the second section of the original act, it was provided that the Governor should approve all laws passed by the legislative assembly before they should take effect, thus requiring the absolute concurrence of the Governor, and constituting the executive a part of the legislature, or lawmaking department of the government.
An examination of the Revised Statutes of the United States will show that this provision is now repealed. This was effected by an act passed March 2,1863, relating primarily to the territory of Colorado, but made applicable, in part, to this territory: 12 Stats, at Large, 700. This last-mentioned act gave the Governor the usual veto power, but provided for the passage of bills by the assembly over the veto, thus recognizing the usual distinction between the legislative and executive .departments, and assimilating the system of legislation to that of the states and of the United States: Rev. Stats., Sec. 1842.
It will be noticed, however, that the original provision of the Organic Act, by which the legislative power is vested in the Governor and a legislative assembly, is still retained in the Revised Statutes, (section 1846,) whence we must conclude that these two •sections are not repugnant, but are to be read together, if possible, which, it is manifest, may be readily done.
Let us now examine the provisions of section 12 of the Organic Act, already quoted. Obviously it was necessary that some provision should be made for the first meeting of the legislature. Hence we find that the Governor was authorized to designate the *404 place for holding such first session, but the legislature — that is, the Governor and legislative assembly — were directed “to proceed thereafter to locate and establish the seat of government * * * at such place as they may deem eligible;” in other words, wherever 'they may choose to locate and establish it. And it may not be out of place here to call attention to the same omission on the part of Congress to restrict the choice of location in terms to the territory of Dakota, that counsel for respondent have noted with some severity of criticism, in the territorial statute of 1883.
Realizing, however, that in such a vast territory the center of population and commerce would, in all probability, shift from its original location, and thus render a further change or changes desirable, and with the purpose, no doubt, of avoiding any question which might arise as to the power of the legislature to make such change, the further clause is added: “ Which place, however, shall thereafter be subject to be changed by the said Governor and legislative assembly.” This seems to us to be the full scope and purpose of the section referred to. We do not regard it as either an enlargement or limitation of the general legislative powers already conferred, but as a declaratory provision inserted by way of precaution; and, whether considered as pertaining to the strictly law-making functions of the legislature or to those administrative functions belonging to every legislature, this power could, at least, be properly exercised in the form of a legislative act, as such functions are usually exercised by legislative bodies.
In accordance with this view was the action of the territorial legislature, which, by enactment in the usual form, passed by the legislative assembly, and approved by the then Governor, April 8, 1862, located and established the seat of government at Yankton. Strangely enough, however, all the counsel who have presented printed briefs in this case seem to have overlooked the fact that *405 this is not the provision of law now in force applicable to this territory. Some of them.have cited the section of the original act above quoted, while others have cited section 1885 of the Eevised. Statutes, which is substantially the same. But section 1885 in> terms applies only to territories thereafter to be organized, while section 12 of the original, act is superseded and repealed by the enactment of section 1944 of the Eevised Statutes, which reads as follows: “ The seat of government of the territories of [naming seven, Dakota among them,] may be changed hy the governors and legislative assemblies thereof, respectively.” And this is the provision now in force in this territory.
Eor the reasons already stated, however, we do not think any substantial change in the law was effected by this enactment; it merely re-enacted so much of the former act as was then applicable to the territories named. What we have said, therefore, in considering the former act, is in the main applicable to the present one.
With this general review of- the powers of the legislature in respect of the subject-matter of this controversy, we are now prepared to consider the act in question, and to ascertain whether ,. such of its provisions as are assailed in this proceeding are in conflict with any of the principles by which legislative bodies possessing general powers of legislation are governed in similar cases; for to this point, as we think, is the discussion brought by the views already, expressed- Over 20 years have elapsed since the passage of the first act locating the seat of government, during which vast tides of immigration have been flowing in upon these broad and fertile plains. Yankton, once the practical center of population, has become, to by far the greater part of this new population, remote and inconvenient of access, and at its last session the legislature, deeming the time to have arrived when it was *406 expedient to remove the seat of government to some place better adapted to the convenience and growing needs of the community, passed the act entitled “ An act to provide for the location of the seat of government of the territory of Dakota, and for the erection of public buildings thereat,” which act was duly approved by the Governor, March 8,1883. Sections 2 and 4 comprise the provisions directly assailed by this action.
Upon the argument before this court a considerable portion of the discussion was devoted to the inquiry whether, the exercise of the power of changing and relocating the seat of government pertains to the administrative or to the purely law-making functions of the legislature. Possibly it may involve both. Prescribing by law that a change shall be made and a new location selected, and the mode in which this shall be accomplished, would seem to pertain closely to the law-making function. But, whether so or not, the actual selection of a suitable location, and the erection of buildings and improvements thereon, are clearly, as we think, acts of an administrative character. Undoubtedly there maybe combined in one section, as has sometimes been done, a declaration of the legislative will that a change be made, and a selection and designation by the legislature of a new location. Or, as has also frequently been done, the former may be expressed in one portion of the act, while in other portions thereof provision is made for the latter.
We are of the opinion that, if not wholly administrative, so much at least of the act in question as relates to the selection of a new site, and the erection of suitable buildings and improvements thereon, is clearly of an administrative character. The legislative will that the seat of government be removed, that it be located and established as in the act provided, and that the site selected and determined upon by the commissioners, in pursuance of the provisions of the act, shall be the permanent seat of government of the *407 territory, is definitely expressed in the act itself. Tlie undoubtedly important and responsible duties of selection and preparation for occupancy were delegated to these commissioners. Tbe convenience of such delegation, the obvious difficulties in the way of a direct selection by tlie legislature, have been already alluded to. What legal principle is contravened by the delegation of this power? The legislature made the law. Every act done under it by these commissioners is done in pursuance and by authority of the law, and derives its sole vitality therefrom, and.when done is to be regarded as the act of the legislature itself.
Legislative precedents in such cases are of great' value. As remarked by Justice Oaton in the case of The People v. Reynolds, 5 Gilman, 1: “In determining what is legitimate and proper legislation we feel warranted in looking at the past to see what kind of laws legislative bodies have been in the habit of passing.”* And an examination of such precedents will show, that the provisions in question are in harmony with the long-established and well-nigh universal practice of legislative bodies, federal, state, and territorial.
Only alluding in passing to the unchallenged legislative practice of this territory, in common with many other states and territories,, of delegating, to commissioners and others the power to locate county seats, and do many other administrative acts which the-legislature might undoubtedly do 'itself, we shall cite but a few of' the more important of the legislative precedents just referred to.. Tbe territory of Iowa furnishes one of these. In its essential features the Organic Act of that territory was the same as that of Dakota. I very much regret that the statutes of the territory of Iowa are not accessible by me at this time. Though cited at some length upon the supplemental brief of counsel for respondents,, some facts'which I deem of importance are omitted. Briefly *408 •stated, however, it appears that in January, 1839, the territory of Iowa passed an act providing for the location of the seat of gov-•emment through the agency of three commissioners who were appointed to select a site, lay out the grounds, sell lots, and from the proceeds erect suitable buildings. My recollection is that these commissioners were appointed by joint* resolution, and that they were required to report their proceedings to the Governor; but I •cannot affirm this with certainty. The territorial capital was selected and located pursuant to the provisions of the act.
Counsel for the. respondents, however, claim that because, by the terms of a supplemental act passed at the same session, no further steps were to be taken after the selection and report thereof to the Governor until the consent of. the United States should be. obtained, and a donation of the land made by them, this precedent is to be regarded as opposed to, rather than one in favor of the legislation in question. But upon examination of the supplemental act it will appear that the consent which was to be obtained Was not to the method adopted for making the selection, but to the appropriation of the land selected for the purpose designated, and that such consent was to be obtained, if possible, in the form of a grant or donation of the laud. And such seems to have been the view taken of it by Congress, for we find that by an act 'passed March 3, 1839, Congress “ appropriated and granted to the terri- “ tory of Iowa one entire section of land, of arvy of the surveyed “ public lands in said territory, for the purpose of erecting thereon “ the public buildings for the use of the executive and legislative • u departments of the government of said territory: Provided, “ That the said section of land shall be selected wader the authority “ of the territorial legislature, the seat of government located “ thereon, and notice of said selection officially returned to the reg- “ ister of the land office in the district in which the land is situated, “ within one year from the passing of this act.”
*409 It is especially noticeable that the selection was directed to be made, not. “ by the-G-overnor and legislative assembly,” but “ under the authority of the territorial legislature.” No other authority for the selection of a site appears to have been given by the territorial legislature than that already referred to. It must be presumed that' these acts were before Congress at the time of the passage of the donation act, and this legislation must, therefore, be considered to have received the sanction of. that body, and to. furnish an important precedent for the legislation in question.
In the case of Clinton v. Englebrecht, supra, in which the validity of the jury laws of the Territory of ITtah was in question, the court say: “ The uniformity of construction by so many ter- “ ritorial legislatures of the Organic Act in relation to their legis- ££ lative authority, especially when-taken in connection with the “ fact that none of these jury laws have been disapproved by Oon- “ gress, though any of them would be annulled by such disap- ££ proval, confirms the opinion, warranted by the plain language of il the Organic Act itself, that the whole subject-matter of jurors t£ in the territories is committed to territorial legislation.” And again: ££ In the first place, we observe that the law has received ££ the implied sanction of Congress. * * * The simple dis- “ approval by Congress at any time would have annulled it. It i£ is no unreasonable inference, therefore, that it was approved by ££ that body.”
In the Iowa ease the attention of Congress must have been specially directed to the territorial law.
Another precedent is furnished by the state of Illinois, the site for whose capital was selected by commissioners, appointed in and by an act of the legislature of that state, passed in 1819. ■ The value of this precedent, also, is assailed by counsel for the respondent, on the ground that the Constitution of the state con- *410 tamed an express provision for the selection of the site in this mode. The fact is as stated. The Constitution of Illinois, after directing the general assembly to petition Congress for a grant of land, did further direct that if such petition should be granted, the general assembly, at their next session thereafter, should provide for the appointment of five commissioners to make the selection of the land so granted.
Nut it is the propriety of this kind of legislation which we are now considering, as evidenced by the practice of other legislative bodies, and this provision of the Illinois constitution may, we think, be fairly regarded as an expression of the opinion of the people of that state that the mode of selection therein prescribed was the most suitable and proper one. In Nebraska, also, the present capital of the state was located by a commission composed of the Governor, Secretary of State, and Auditor, named in and appointed for the purpose by an act of the legislature of 1866-67, which removed the capital from Omaha, and located it at a point to be thereafter selected. So, also, was the seat of our Federal government selected and located.
The general power of Congress for this purpose is found in section 8, of Article I, of the Constitution, where the right of exclusive legislation is given “ over such district (not exceeding ten .miles square) as may, by cession of particular states and the acceptance of Congress, become the seat of government of the United States.” By chapter 28, 1 Statute at Large, 130, it was enacted “ that a district of territory not exceeding ten miles square, to be “ located as herei/nafter directed, on the river Potomac, at some u place between the mouths of the eastern branch and Con- “ nogochegue, be and the same is hereby accepted for the perma- “ nent seat of government of the United States.”
By the second section the President was authorized to appoint *411 three commissioners, who, under his direction, “ should survey, define, and limit a district of territory within the limits named,” “ and the district so defined, limited and located shall he deemed the district accepted hy this act for the permanent seat of government of tlie United States.”
It may be worthy of note in this connection, as pertinent to some adverse eritieism upon the provisions of sections 1 and 16, of the territorial act, although we do not deem it essential to a determination of this controversy, that the act of Congress makes a somewhat similar provision.
The seat of government at-that time was the city of New York. Section 5, of. the act of Congress, provides “ that, prior to the first ■“ Monday in December next, (1790,) all offices attached to the “ seat of government of the United-- States shall be removed to, “ and until the said first Monday in December, in the year one “ thousand eight hundred, [the date fixed for the completion o£ “ suitable accommodation at the new seat of government,] shall “ remain at, the city of Philadelphia, in the state of Pennsylvania, “ at' which place the session of Congress next ensuing the present “ shall be held.” Section 6 then provides that on the first Monday in December, 1800, the seat of the government, and all offices attached thereto, shall be transferred to the district and place selected for the permanent site thereof.
Nowhere in the act is Philadelphia designated, in terms, as a temporary seat of government, although such a purpose may be inferred from the title of the act, which is “An act for establishing the temporary and permanent seat of government of the United States.” ^
We do not propose, however, to consider this particular matter further.
Numerous other discretionary powers, which are by the Oonsti- *412 tuition expressly vested in Congress, have been from time to time delegated by that body to the President and other executive officers; as, for instance, “ to raise and support armies,” (1 Stats, at Large, 223, 243, 558;) “-to grant letters of marque and reprisal,”' (2 Stats, at Large, 755;) “ to borrow money on the credit of the United States,” (1 Stats, 'at Large, 187, and elsewhere;) “ to^ make rules for the government and regulation of the land and naval forces,” (1 Stats, at Large, 569;, 2 Stats, at Large, 819;) daring the rebellion, “ to suspend the writ of habeas- corpus whenever, in his judgment, the public safety may require it,” (12 Stats, at Large, 755.)
With this brief view,of some of the legislative precedents, we proceed now to consider lome of the .cases in which judicial sanction has been given to legislation of the same character as that in controversy. It is a difficult task to select, from the great mass of concurrent decisions upon this point, a limited number of those most pertinent to the circumstances, but we shall cite a few which we deem appropriate and decisive.
The case of Upham v. Supervisors of Sutter Co., 8 Cal., 379, was one in which the validity of an act providing for the removal of a county seat upon a vote of the citizens was in question. The court say: “ Providing for a place does not necessarily include “ its direct selection. If the mode of selection is prescribed by “ law, then the place is provided for. By the Constitution the “ legislature is required to provide for many objects which cannot “ be effected by the direct action of the legislature; and while the “ maxim delegatus non potest delegare is, undoubtedly, true, “ the extent of its application to legislative bodies must depend “ upon the nature and design of the legislation, and the means “ necessary to accomplish the design. * * * ” In Hobart v. Butte Co., 17 Cal., 24, a case involving the validity of bonds issued under a statute which submitted the question of issuance to *413 a popular vote, tlie court say: “Every attribute of a law is im- “ pressed upon the act of 1860. The legislative will is complete “ in itself and in its expression. It is by force of the law that “ the bonds are authorized and issued. It is true that the issuance “ depends upon the will of the electors, but this condition is affixed “ by law, and is as much an emanation of the sovereign authority “ as is the grant of power.” Elsewhere in the same opinion it is said: “ Laws are passed every day which depend for validity upon “ the acts of individuals; for example, such acts as the removal of “ capitals,- court-houses, etc., upon donations or other advantages “ "being secured.”
The case of People v. Reynolds, 5 Gilman, (Ill.) 1, already cited, is very instructive. The court there say: “ If we take the action “ of all past legislators in determining what'may and should prop- “ erly be done in the exercise of legislative powers, we see that “ while they are bound to make the laws, yet those laws need not “ be 'absolute, nor make every provision for doing that which “ they may authorize to be done; while all must be done-under “ their sanction, yet they.need not do all, nor command all,— “ a law may depend upon a future event or’ contingency for its- “ taking effect, and that contingency may arise from the voluntary “ act of others. * * * If we say. that this is an unauthorized “ delegation of legislative power, we forget what is a legitimate- “ and proper exercise of that power. If the saying be true that “ the legislature cannot delegate its powers, it is only so in its “ most general sense. "We may well admit that the legislature “ cannot delegate its general legislative authority, still it may au- “ thorize many things to be done by others which it might prop- “ erly do itself. ■ All power possessed by the legislature is dele- “ gated to it by the people, and yet few will be found to insist “ that,whatever the legislature may do it shall do, or else it shall *414 “ go undone. To establish such a principle in a large state would “ be almost to destroy the government. * * * 'We see, then, “ that while the legislature may not divest itself of its proper “ functions, or delegate its general legislative authority, it may “ still authorize others to do those things which it might properly, “ yet cannot understanding^ or advantageously, do itself. * * * “ The object to be accomplished may be specified, and the' rest “ left to the agency of others, with better opportunities of accom-u plishing the object or doing the thing understandingly.”'
In Locke's Appeal, 72 Pa. St., 491, Justice Agnew, speaking for the Supreme Court, says: “ What is more common than to “ appoint commissioners under a law to determine things, upon e- the decision of which the act is to operate in one way or another? “ * * * Then the true distinction, I conceive, is this: — the leg- “ islature cannot delegate its power to make a law, but it can make “ a law to delegate a power to determine some fact or state of “ things upon which the law makes or intends to make its own “ action depend. To deny this would be to stop the wheels of “ government. There are many things upon which wise and use- “ ful legislation must depend which cannot be known to the law- “ making power, and must therefore be the subject of inquiry and “ determination outside the halls of legislation.”
By section 9, of Article I, of the Constitution of the United ■States it is declared 'that “ the privilege of the writ of habeas ■corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it.”
The Supreme Court of Wisconsin, (In re Kemp, 16 Wis., 382,) decided that the power to suspend this writ was a legislative power, and was vested in Congress; and that the proclamation of the President suspending the writ was for that reason void. Congress subsequently passed an act (already cited) conferring this power *415 upon the President, and the same court, (In re Oliver, 17 Wis., 681,) sustained the validity of that act.
It is useless to multiply precedents. We cite for reference, without quoting, Burr v. Blanding, 13 Cal., 357; Moers v. City of Reading, 21 Pa. St., 202; C. & W. & Z. R. Co. v. Com'rs, 1 Ohio St., 88; Wayman v. Southard, 10 Wheat., 1; Slack v. M. & L. R. Co., 13 B. Mon., (Ky.) 1; State v. Parker, 26 Vt., 357.
Our conclusion is, that the provisions of this act for the selection by commissioners of a suitable location for the seat of government, and for the erection thereon of the necessary buildings and improvements, are a lawful and proper exercise of legislative authority, and that the act in question is, in these respects, valid and operative.
The remaining question is,, as to whether the designation of the commissioners by name in the act itself was' lawful, being contended by the respondent that such designation is in conflict with section 1857, of the Revised Statutes of the United States, which requires that the Governor shall nominate, and, by and with the advice and consent of the legislative council, appoint, all ofiieers, except certain ones otherwise provided for. This question we shall consider very briefly.
íhe officers contemplated by that section are, in our opinion, those continuously employed in the regular and permanent administration of government; those by whom the territory performs its usual political functions — its functions of government: Sheboygan Co. v. Parker, 3 Wall., 39.
The duties to be performed by these commissioners are of the most temporary character. Their functions wholly cease with the completion of those duties; and we do not think they can be regarded as officers, within the meaning of the section of the Organic Act referred to. Legislative and judicial proceedings for this view *416 might readily be multiplied, but we deem it unnecessary to do more than cite a few, for reference, in addition to the one above mentioned: Shepherd v. Com., 1 Serg. & R., 1; Com. v. Sutherland, 3 Serg. & R., 145; State v. Kennon, 7 Ohio St., 546; Branham v. Lange, 16 Ind., 497; People v. Nichol, 52 N. Y., 478; In re Attorneys' Oaths, 20 Johns., 493; U. S. v. Hatch, 1 Pinn., (Wis. Terr.) 182; People v. Middleton, 28 Cal., 604. In this respect, also, we must uphold the validity of the act in question.
The importance which has been given to this case by the acrimonious contest over the removal and relocation of the capital, and the general interest with which the decision of this court was awaited, have suggested the belief that such a presentation of the legal principles upon which our judgment is based as would render them measurably clear to the popular comprehension, would perhaps be anticipated, and indeed it were well if our citizens generally were better acquainted with the sources and extent of their political powers. These considerations have led to a somewhat more ■extended exposition of our views, and to a fuller quotation from •the precedents cited, than we should otherwise have deemed necessary, since we regard the questions presented, when viewed in their true aspect, as free from any considerable legal difficulties, and have no hesitation in declaring that in our opinion the appellants are lawfully entitled to exercise the duties of their appointment under the act in question.
The judgment of the District Court must therefore be reversed, and judgment given by that court for appellants upon the pleadings. Ordered accordingly.