# CIRCUIT COURT REPORTS.

## NEW SERIES—VOLUME VIII.

---

## CAUSES ARGUED AND DETERMINED IN THE CIRCUIT COURTS OF OHIO.

---

### VALIDITY OF CONTRACT FOR CONSTRUCTION OF WATER WORKS.

[Circuit Court of Lucas County.]

HOMER T. YARYAN, A TAX-PAYER, ETC., v. THE CITY OF TOLEDO ET AL.

Decided, March 31, 1906.

*Municipal Corporations—Legislative Power not Delegated, When—Construction of the Phrase "Lowest and Best Bidder"—Discretionary Power of Board of Public Service in the Award of Contracts—Specifications for Public Work—Deviation as to Materials and Construction—Bids as a Whole and Separate Bids—Sections 794, Revised Statutes, and 143 Municipal Code—Appropriation of Sum Less than Needed not an Abuse of Power, When—Municipal Water Works—Suit by Tax-payer to Enjoin Carrying Out of Contract.*

1. The preparation by the board of public service of plans, estimates, specifications and profiles for a new municipal water works system, in accordance with a determining ordinance by council, is not an exercise of legislative power, and authority so to do is conferred upon such board and may be exercised by it, notwithstanding Section 127 of the Municipal Code which provides that all power unless otherwise provided is to be exercised by council.

1

2. The provision of Section 143 of the Municipal Code that the board of public service shall make a contract with the lowest and best bidder, or may reject any and all bids, does not limit the board to a mathematical computation as to who is the lowest responsible bidder, but permits the board to go beyond the price bid and the character of the bidder, and to accept the best proposition offered, considering quality, feasibility and efficiency of the thing to be furnished, the qualifications and responsibility of the bidder, and the price proposed in view of all the other considerations.

3. Where the work is of the character involved in the building of an extensive municipal water works plant, it is not necessary that the specifications to be submitted to the bidders should go into any greater detail than is required to make the matter intelligent to persons competent to do the work and furnish the materials.

4. Such a contract is not rendered invalid by reason of failure to comply with Section 794, Revised Statutes, providing that municipal officers shall require separate bids for contract work or materials, where it does not appear that separate bids were received covering the whole work to be performed and materials to be furnished amounting to less in the aggregate than the amount of the bid for the work as a whole which has been accepted.

5. The fact that council limited the amount for which contracts could be let to the sum then available for that purpose, whereas a much larger sum will eventually be needed to complete the system, does not indicate that council has no intention of making a further appropriation at some future date, and the letting of a contract for a part of the system within the limitation, is not an abuse of power.

PARKER, J.; HAYNES, J., and WILDMAN, J., concur.

This action was begun in the court of common pleas to enjoin the carrying out of a contract entered into between the Board of Public Service of the City of Toledo and the Norwood Engineering Company, on the 6th of November, 1905, whereby the latter agreed to construct part of an extension of the Toledo water works system, for a certain compensation agreed upon, to be paid by the city. The case was tried in that court and appealed to this court. The person who was the city solicitor at the time this action was begun, Mr. U. G. Denman, upon application to him, declined to institute the suit, and thereupon a tax-payer began the suit, as he is permitted to do by the statute. The suit was instituted on December 5th, 1905. The petition, in the first instance, was filed against the city, the city

treasurer, the city auditor and the members of the board of public service. On their respective applications the Norwood Engineering Company, the principal contractor, and A. Bentley & Son, sub-contractors, were brought in as defendants with leave to answer. The petition sets forth eighteen separate grounds of objection to the proceeding up to and including the letting of the contract, any one of which it is said challenges what amounts to such irregularity and disregard of mandatory conditions and restrictions imposed by law as renders the contract illegal and nugatory and calls upon the court to prevent its performance, and an additional ground is stated in an amendment to the petition.

The city, through Mr. Denman, as city solicitor, filed an answer in which it controverts these allegations of irregularity and invalidity, and the city treasurer filed a like answer. Subsequently a new council came into office and the personnel of the different offices changed, and new officers were substituted in the record for those who had gone out; and a new city solicitor succeeded Mr. Denman in office, to-wit, Mr. Northup, who obtained leave and filed an answer and cross-petition for the city in which it admits all the matters set forth in the petition, repeating the same and adding some other alleged irregularities and illegalities in the procedure, and joins in the prayer for an injunction and for nullifying of the contract. Upon all material averments of the petition and cross-petitions, the Norwood Engineering Company and A. Bentley & Son, by their separate answers—which are substantially alike in form—joined issue with the plaintiff and the city. They also allege certain facts and circumstances of the transaction, especially as to the acquiescence of the plaintiff and the city in the work going forward, to a degree, before the suit was instituted, which are relied upon as establishing a waiver or estoppel.

These allegations of new matter are met by a denial. The case has been tried in this court and it has developed that there are no material facts in dispute, but that all important differences arise out of different constructions put upon the laws and ordinances bearing upon the transactions in question. It also appears that specifications of alleged material irregularities

are, in many instances, due to varied statements of the same thing, and an analysis thereof in so far as the evidence adduced tends to sustain the same, permits of their reduction to four general heads. Before stating or discussing these, however, I will attempt to give a brief history of the matters out of which this controversy has arisen as the same is disclosed to us by the pleadings and the evidence.

It appears that as early as the spring or summer of 1902 the question of increasing and purifying the water supply of the city and its inhabitants for domestic and other uses had engaged the attention and interest of the public and the water works trustees to a degree that moved the latter to engage three eminent experts, Allen Hazen, G. H. Benzenberg and W. G. Clark, as an engineering commission to investigate and report upon the matter. The scope of their commission is best set forth in a letter addressed to them by the water works trustees on the subject; it is as follows:

"WATER WORKS DEPARTMENT,

"CITY OF TOLEDO.

"*Gentlemen*—The question which you are called upon to determine in connection with your investigation and study here, is the best method of securing for this rapidly growing city, an ample supply of clear, pure and wholesome water for domestic, manufacturing and municipal purposes.

"In your study of the subject you are to take into consideration all the schemes that have been proposed here, and any others that may suggest themselves to you, with a view of meeting the requirements of this city, for, say the next forty years. If some method should present itself which would be satisfactory for a limited time, say fifteen or twenty years, which possessed considerable economical advantages against a more permanent solution, we wish you to include same in your report, together with your recommendations for the immediate and future needs of the city, and the probable cost of each.

"All information heretofore gathered will be submitted to you, and whatever work, information or tests you may require to assist you in your investigation, will be furnished upon application to the board.

"(Signed) W. A. KUHLMAN, *Pres.*,

"HENRY KELLER,

"W. T. DAVIES,

"*Trustees.*"

This commission, it appears, entered upon this investigation, and the result thereof is set forth in a printed report, in pamphlet form, of fifty-two pages, introduced in evidence as Exhibit "U." The date of the report is December 20, 1902. The pamphlet was printed some time in 1903, as it appears from the date on the back of it. It discloses that great skill, care and industry was devoted to the problem by the gentlemen of the commission, and the report sets forth very fully the various available sources of water supply for the city, various methods of bringing the same to the city, and various methods of purification, and the elements of cost of procuring the supply and purifying the same are set forth in each case separately as well as the cost of maintaining each system; and the comparative merits of different plans and systems in point both of cost and efficiency, are set forth. Their recommendation, after a discussion and consideration of the whole matter, is as follows:

"Upon a careful consideration of all questions bearing upon the proposed improved water supply for this city, your commission recommend that the Maumee river be continued as the source of supply, that the water be taken from the main channel in the river nearly opposite the house of the Country Club, and that for that purpose and for the location of the necessary purification works an effort be made to secure the golf course of the Country Club. Should it not be possible to secure said property, then we recommend that so much of the low ground north of the golf course be secured as may be necessary for a low-lift pumping station and a roadway from there to Broadway, and about twenty-five acres of land located anywhere along the west side of Broadway between a point west of the above proposed pumping station site and Delaware creek.

"We further recommend that upon these cites a low-lift pumping station and a suitable purification plant, with clear water reservoir suitably equipped and in conformity with the requirements as set forth in the above report as neccessary for the next fifteen or twenty years, be erected and properly connected with each other and the main pumping station, as soon as possible. These works can thereafter be enlarged as the increased consumption may make it necessary, and the entire works should be designed in a comprehensive manner so as to permit such extension without causing any derangement of any of its existing parts.

"We further recommend that if at any time it should become possible for the city to secure the right to use water from the Miami & Erie Canal for a period of years, in quantity sufficient to supply the consumption, a suitable connection should be made between the canal and the coagulation basins and that the supply be taken from the canal, and that the necessary betterments along the canal, as indicated in our report, be made. The reduction in cost of operation will amount to about two dollars per million gallons drawn in this way.

"We further recommend that such purification plant be thereupon placed in charge of a competent and experienced person to operate it, and we are satisfied that the purified Maumee river water will prove to be an ample supply of pure and wholesome water. Respectfully submitted,

"(Signed) G. H. BENZENBERG,<br>
"ALLEN HAZEN,<br>
"WM. G. CLARK,<br>
"*Engineering Commission.*"

The plan or system recommended by the engineering commission, and subsequently adopted by the council, and upon which the board of public service formulated plans and specifications and let the contract to the Norwood Engineering Company, is that known by the general description of the American Mechanical Filtration System, as distinguished from certain other general systems, including the English or Slow Sand Filtration System. Each of these general plans admits of considerable variation in matter of detail of construction and operation. Their estimate of the cost of such an addition to the water works plant as they recommended was $1,204,390, but they set forth the cost of certain parts that they thought might be omitted for the present, amounting to $431,200, reducing the cost to $773,190.

These estimates are very much lower than those for other plants considered by them. In pursuance of this report, or, at least, agreeably to it, the council subsequently provided for the purchase of land in the vicinity described, for such purification plant, and about thirty acres were purchased at a cost of $38,000. As to steps subsequently taken to carry out this project, I go to the undisputed history set forth in the pleadings, and I shall refer somewhat to the facts in evidence,

and because it includes all that is set forth in the petition of the plaintiff, and somewhat more, I refer to the answer and cross-petition of the city. It is therein averred that on the 22d day of August, 1904, the council of the city of Toledo passed an ordinance—a copy of which is set forth in the pleadings—the title of which reads:

"An ordinance declaring it necessary to issue bonds for procuring real estate and right of way, and for extending, enlarging, improving, equipping, furnishing and securing a more complete enjoyment of the water works of the city of Toledo."

The ordinance consists of but one section. I shall not stop to read it. However, it sets forth that it is deemed necessary to issue bonds to the amount of $500,000 for the object stated; and the purpose of the council to provide therefor. Then on the 12th day of September, 1904, the council of the city passed an ordinance entitled, "An ordinance to provide for the issue of bonds of the city of Toledo, state of Ohio, to pay the cost and expense of procuring the necessary real estate and right of way for extending, enlarging, improving, equipping, furnishing and securing a more complete enjoyment of the water works of the city of Toledo," and therein the issue of the $500,000 of bonds is provided for, and their denominations, time of payment, rate of interest, method of sale, etc., are particularly set forth. It is alleged that these bonds were duly advertised and sold; that thereafter, on the 8th day of May, 1905, the council of the city passed an ordinance entitled as follows:

"An ordinance declaring the necessity for extending, enlarging and improving the present water works system of the city of Toledo and equipping and furnishing such extension and to secure a more complete enjoyment of the same by supplying pure and clear water to the city and the inhabitants thereof and authorizing a contract for the construction of certain parts thereof."

The sections of this ordinance, being three in number, are preceded by a number of whereases. The whole ordinance is as follows:

"WHEREAS, the city of Toledo is now the owner of a system of water works for supplying water for its own use and its inhabitants, and

"WHEREAS, said system as it now exists is inadequate to meet the public demands and supply sufficient pure and wholesome water for the use of the city and persons desiring to use the same, and does not provide in any way for clarifying or purifying the water supply through it, and

"WHEREAS, it is deemed necessary for the public health and for the welfare otherwise of the inhabitants of the city of Toledo to install a system for the purification of water from the Maumee river for the use of the city and its inhabitants thereof, and

"WHEREAS, this subject has been given careful consideration by eminent engineers whose recommendations have been approved by the State Board of Health of the State of Ohio, and

"WHEREAS, certain other methods of purification have been suggested by certain parties,

"*Now Therefore,* Be it ordained by the council of the city of Toledo, state of Ohio,

"SECTION 1.    That council hereby declares it to be necessary and that it is its intention to cause to be installed and constructed the necessary water works, to extend, enlarge and improve its present system of water works by means of the necessary intake piers in the Maumee river, conduits, aquaducts, reservoirs, pumps, machinery, buildings, filtration and purification plant and works and the necessary equipment and furnishings for the same to supply clear and wholesome water to the city and the inhabitants thereof, and all of said extensions, enlargement and improvement shall be connected with and made a part of the city's present water works system.

"SEC. 2.    That council hereby gives its consent for and authorizes the construction and installation of said water works extension and all parts thereof and hereby authorizes and directs the Board of Public Service of the City of Toledo to advertise for a period of four (4) weeks for bids according to law for the construction of any or all parts of said water works extension and to let a contract or contracts to the lowest and best bidder or bidders for the construction and installation thereof or any of the parts of the same.

"All bids and proposals for any and all of said work shall be submitted and received in accordance with law and on forms and on blanks which will be furnished by the board of public service of the city, provided,

"First. That bids shall be received, specifications prepared under the direction of the board of public service of the city in accordance with the plans heretofore approved by the State Board of Health of Ohio, for the city of Toledo, copies of which plan and their constructions are now on file in the office of the board of public service of the city and which are hereby approved.

"Second. That alternative bids and proposals shall be received for the installation of other systems of purifications than that provided for in the above mentioned plans to be furnished by the bidder under general conditions to be specified by the board of public service so as to insure a capacity for the purification of twenty million gallons of water every twenty-four hours and to provide for ready and economical expansion of the plant to an ultimate capacity of sixty million of gallons every twenty-four (24) hours and to secure in all cases a high grade of construction.

"Third. If a contract shall be awarded on any plan or system of purification which has not been demonstrated as successful with water of the character of that of the Maumee river, no payment shall be made by the city until the success has been demonstrated to the satisfaction of the board of public service, but in no case shall there be paid to the contractor for any system or plan more than eighty (80) per cent. of the value of the work already completed when partial payment shall be asked for and made and the value of said work so already completed shall be determined by the board of public service on the estimate of said board as to what proportion said completed work bears to the whole work to be done, and in all cases the contractor shall make entirely at his own expense such tests of the construction, practicability and efficiency of the plans and system by him installed as may be required by the board of public service to show to the satisfaction of said board that such plant and system will do the work represented and guaranteed by the contract or for it to do. In no case shall the final estimate for partial payment be made to the contractor for the plant and system installed until said satisfactory tests have been made and the work finally accepted by the board.

"Fourth. No bid shall be accepted until a bond is given to the city of Toledo, Ohio, to the approval of the board of public service as to the efficiency and amount and of the city solicitor as to form, and conditioned to save and protect the city of Toledo from any and all loss, damage, judgment and decrees from, through or in connection with the construction and installation of the plant system and against any increase over

·the cost price provided for in the contract, and conditioned further that the contractor will protect, defend and save the city of Toledo from any and all damages and expense of litigation, judgments, and decrees incurred by, instituted or entered against it by persons, firms or corporations claiming patent rights or other rights on such plant or system or any part or parts thereof.

"Fifth.    The board of public service may advertise for bids and let contract for such part or parts of said water works extension at such times and in such order as to said board shall be deemed for the best interest of the city in securing a first-class, good and economical construction, provided that contracts shall not be let for said water works extension, which in the aggregate amounts to more than five hundred and sixty-five thousand ($565,000) dollars, which sum is now available in the treasury and which is hereby appropriated to meet such cost and expense from the money heretofore realized from the sale of bonds for the purpose and from the funds heretofore received as charges for water in the department of public service.

"Sixth.    All bidders shall be required to state in their respective proposals at what time they will begin and complete the work, or said times may be fixed by the board of public service, and all profiles, plans and specifications for the work shall be expressly made a part of the contract therefor.

"SEC. 3.    This ordinance shall take effect and be in force from and after the earliest period allowed by law.

"Passed May 8th, 1905."

Thereafter, the said John Stolberg, Milton Taylor and John D. Nolen (I read from the cross-petition), as the board of public service of said city, duly separated the work and construction required to be done under and by virtue of such ordinance passed May 8, 1905, into eight (8) separate and distinct contracts as follows:

Contract No. 1.    Being a contract for pumps and gas engines and other machinery for a pumping station necessary to be erected in connection with said plant.

Contract No. 2.    Being Section 1 of the conduit system which said conduit system was necessary to conduct clear water from the filtration plant proper to the water works pumping station of said city.

Contract No. 3.    Being the contract for the construction of Section 2 of said conduit system.

Contract No. 4. Being the contract for the construction of the filtration plant proper in connection with said system, which was afterwards awarded to the defendant, the Norwood Engineering Company, as hereinafter set forth.

Contract No. 5. Being the contract for the construction of an office building on the site of the said filtration plant.

Contract No. 6. Being the contract for the installing of heating plant for said office building.

Contract No. 7. Being a contract for making certain borings in the earth for testing purposes.

Contract No. 8. Being a contract for Section 3 of said conduit system.

The cross-petition further says that after the 8th day of May, 1905, the board of public service caused to be published and circulated a legal advertisement and notice to bidders, which is therein recited. I will refer to this later. I call attention now to one clause appearing in it, which I may have occasion to discuss: "Copies of the plans, proposal forms, specifications and form of bonds and contract can be seen at the office of the chief engineer, Valentine building, Toledo, Ohio, or at the office of Consulting Engineer Chas. L. Parmalee, 136 Liberty street, New York."

This advertisement, I should mention, was for the letting of a contract for the construction of the water purification works, being contract No. 4, for the improvement of the water supply. In pursuance of this advertisement, which was very extensively published and circulated, numerous bids were received, seven of which are designed to be complete, covering the whole contract, and a number of others, for certain parts of the work comprised in contract No. 4. The pleading also states—and it appears as an admitted fact—that the bid of the Norwood Engineering Company to construct the whole work comprised in contract No. 4, of $483,327 was accepted, and a contract was let in pursuance thereof. The pleading also sets forth that previous to this, contract No. 1 was let to the S. M. Jones Company for $54,000—No. 1 being a contract for pumps and gas engines and other machinery for pumping station necessary to be erected in connection with said plant. It also sets forth—

and it appears to be true—that these eight contracts are sub-divisions of only a part of the work required to be done in order to complete this proposed plan of extension, and we are informed by the engineers who testified—and it is undisputed—that it will require further subdivisions, numbering up to, perhaps, fourteen, to properly subdivide the work; that is to say, so it may be let systematically to persons engaged in different lines of work and furnishing different classes of materials.

The cross-petition contains averments as to the amount which will be required to complete the entire proposed additions to the water works system. Upon the trial it was conceded that to complete this system upon the basis of furnishing twenty million of gallons of water per day, would require an expenditure of at least $650,000, and that to complete it as contemplated by these plans in such a way as that certain parts will be sufficient and suitable for a plant furnishing sixty millions of gallons of water per day and admitting of the plant being completed in all its parts up to that capacity, would require an expenditure of at least $765,000. Now, this ordinance of May 8, 1905, appropriates for the purposes of this extension $565,000 only.

I should mention, as a part of the history of this transaction, that Mr. Parmalee, a man apparently skilled and learned in such matters, and fully competent, was employed as consulting engineer upon this work, and that under his supervision and with the assistance of the city chief engineer, Mr. Consaul, certain general plans were prepared and the specifications for the different contracts were also prepared, and the same were adopted by the board of public service and approved by the state board of health, as required by law, and the bids were based upon these plans and specifications and such further details as were furnished by the respective bidders. It also appears that in pursuance of permission, duly and lawfully given, part of this contract No. 4 was sublet by the Norwood Engineering Company to A. Bentley & Son, who entered upon the work and expended perhaps $1,200, besides incurring pecuniary obligations for material of a much larger sum, before suit was begun or any demand made to desist; but we dismiss

this phase of the case with the remark that we do not think that all that was done was sufficient, in view of the large amount of expenditure involved, to justify the application of any rule of estoppel to prevent the relief prayed for, even if the principle of estoppel were applicable.

I should also mention that the good faith of the plaintiff in instituting this action was challenged, it being contended that he is not proceeding as a tax-payer and for the benefit of other tax-payers as well as himself, but that he represents Mr. Lightbody, who is one of the unsuccessful bidders and is neither a resident of Toledo nor a tax-payer thereof, and is simply trying to secure another opportunity to bid; that Mr. Lightbody is to pay all costs and expenses of the action. It appears that there was some misunderstanding upon this point between Mr. Yaryan and Mr. Lightbody. We have heard the evidence touching this matter. While Mr. Yaryan is under the impression and seems to have had it represented to him by some go-between, that the costs and expenses were to be taken care of by Mr. Lightbody, Mr. Lightbody denies that the parties so representing to Mr. Yaryan had authority from him to do so, but admits that he has contributed some money—$50, I believe—towards paying the expenses of the suit, and denies that he is giving it financial backing beyond that. So we conclude to pay no heed to this claim of disqualification of the plaintiff, and will go to the merits of the controversy.

Now, as I have said, there are a large number—nineteen or twenty—specifications of alleged fatal irregularities in these proceedings, and all that the evidence tends to establish we resolve under four charges. Before going to this, I should say that there is not anywhere, in the petition or the cross-petition, any charge of fraud or bad faith upon the part of anybody in these proceedings. Neither does it appear from the evidence that there is any ground for such charges; it fairly appears that the parties interested, the representatives of the city and all concerned, proceeded with care, and with entire honesty of purpose.

The first of these charges is: that certain powers lodged in the council by law, were not exercised by it, but that the board

of public service, without authority of law, assumed to exercise such powers. That the council could not delegate these powers to the board of public service, because they were legislative in their nature, and any attempt that the council may have made to delegate such powers to the board of public service was nugatory. This is said of the making of the contract, and of the formulation of plans, *i. e.*, the drafts and specifications. I should say that this is the contention on behalf of the plaintiff. On behalf of the city, the city solicitor has advanced a somewhat different view, but leading to the same result. He seems to be of opinion that the question of the delegation of powers is not involved; that the powers exercised by the board of public service are not legislative, but administrative; but he does not agree with counsel for the plaintiff in the proposition that the only powers that the council may exercise are legislative powers; he contends that the council may exercise administrative powers as well as legislative powers, and that the making of this contract and preparing of these plans was among the administrative powers, or executive, if you please, of the council, and should be exercised by it. Counsel for the contractor contend and agree with the solicitor to this extent: that these are administrative powers; but they insist that the council may not exercise administrative powers, or if it may exercise any, that these are not among the administrative powers that the council may exercise.

The contention that legislative powers can not be delegated by a legislative body to another body that may not exercise legislative powers, may be disposed of by the single remark that that seems to be the undisputed law upon the subject; so that, if these are legislative powers, to be exercised by the council, and the council has undertaken to delegate these powers to the board of public service, which is not a legislative body under the code, of course such action would be nugatory. Now, certain sections of the statute are referred to upon this question, found in Vol. 96 of the Session Laws, which it is conceded contains the law in force applicable to this case, and which I shall use because it is much more convenient to handle, and sectional numbering herein is less compli-

cated than in the Revised Statutes. The power of a municipality to enter upon this work is unquestioned, and is found in Subdivision 15 of Section 7, of what is commonly called the New Municipal Code; and the opening paragraph of that section provides that "All municipal corporations shall have the following general powers and council may provide by ordinance or resolution for the exercise and enforcement of the same." But this section does not throw much if any light upon the controverted point. Section 123 reads:

"The powers of the council shall be legislative only, and it shall perform no administrative duties whatever and it shall neither appoint nor confirm any officer or employe of the city government except those of its own body, except as may be otherwise provided in this act. All contracts requiring the authority of council for their execution shall be entered into and conducted to performance by the board of officers having charge of the matters to which they relate, and after authority to make such contract has been given and the necessary appropriation made, council shall take no further action thereon."

It seems very clear from the reading of this new code that the Legislature started out with the general scheme and purpose of vesting all the legislative powers in the council, and of vesting no powers for its exercise but legislative powers. It does not appear to us that it carried out this plan with entire consistency, though it did so in a general way. It is undoubtedly competent for the Legislature to confer upon the council other powers than legislative powers, and prior to the adoption of this new code, as we know, the council exercised executive as well as legislative powers. Illustrations were given in several sections cited to us of deviations from this plan of confining the council to the exercise of legislative powers only. I shall not take time to refer to them, unless, perhaps to one instance, found in Section 51 of the statutes, where the subject of special assessments is being dealt with, and where it is provided that the council after resolving upon an improvement, "shall thereupon prepare or cause to be prepared plans and specifications, estimates and profiles of the proposed improvement, showing the grade of the same with reference to the property abutting

thereon, which plans, specifications and estimates and profiles shall be filed in the office of the department of public service," etc.

From that provision it is argued upon the one hand that this is a legislative power, because the Legislature had stated, in another part of the code, that the council shall exercise none but legislative power. On the other hand, it is argued that it is a deviation from the scheme of confining the council to the exercise of legislative power, and we think the latter is the proper view of the matter. We think that this matter of the *preparation* of plans, specifications, estimates and profiles, is not a legislative duty.

I go now to the sections upon the subject of the authority of the department of public service, the members of which are known as the board of public service.   Section 138 provides:

"In every city there shall be a department of public service which shall be administered by three or five directors, and the number of said directors shall be fixed by ordinance or resolution of council.   Such directors shall organize as a board to be known as the 'board of public service.'   Directors of public service shall be elected for a term of two years and shall serve until their successors are elected and qualified.   They shall be electors of the city.   They shall make their own rules and all regulations for the administration of affairs under their supervision.

"Section 139.   The directors of public service shall be the chief administrative authority of the city, and shall manage and supervise all public works and all public institutions, except where otherwise provided in this act."

Before reading Section 140 I should remark that it is contended by the city solicitor that the power of the department of public service over works, improvements, buildings, etc., is *supervisory,* and that it has no power to arrange, by contract or otherwise, for the *construction* of such work, especially such a work as this under consideration.   Section 140 provides:

"The directors of public service shall supervise the improvement and repair of streets, avenues, alleys, lands, lanes, squares, wharves, docks, landings, market houses, bridges, viaducts, aqueducts, sidewalks, sewers, drains, ditches, culverts, shape channels, streams and water courses; the lighting, sprinkling and

cleaning of all public places, and the construction of all public improvements and public works, except as otherwise provided in this act.''

Section 141 provides for their management of certain works. Now, our construction of·this section, in connection with Section 143, which I shall read, is, that they have the power to contract for the construction, limited, of course, in a degree by the action of the council in the premises. Section 143 provides:

''The directors of public service may make any contract of purchase of supplies or material or provide labor for any work under the supervision of that department not involving more than five hundred dollars,'' etc.

It is conceded by the solicitor that they may do this, but he contends that where the expenditure exceeds five hundred dollars, the authority is not so extensive, that they may not make contracts for the purchase of supplies, etc. As to such contract this section further provides:

''When any expenditure within said department, other than the compensation of persons employed therein, exceeds five hundred dollars, such expenditure shall first be authorized and directed by ordinance of council, and when so authorized and directed, the directors of public service shall make a written contract with the lowest and best bidder after advertisement for not less than two nor more than four consecutive weeks in a newspaper of general circulation within the city.''

This contract, which the statutes say the board shall make, counsel for the city insists that the board may simply execute; that it performs the same function in the premises that the mayor did formerly, to-wit, the signing of contracts, thereby executing them; that the contract must be formulated and approved by the council, and, necessarily, by legislation of the council, for it is provided in the code that the council can act only through ordinance and resolution. But we think that is not the intention of this statute, for it is provided, further along in the same section, that:

''Whenever it becomes necessary in the opinion of the directors of the appropriate department in cities, or of the council in ·

villages, in the prosecution of any work or improvement under contract to make alterations or modifications in such contract, such alterations or modifications shall only be made by such directors in cities or council in villages, by resolution, but such resolution shall be of no effect until the price to be paid for the work and material, or both, under altered or modified contract, has been agreed upon in writing,'' etc.

It would be a very curious state of affairs if the Legislature had provided, and if this statute should require the construction, that the council in the first instance must make the contract, that the board of public service had no authority to enter into the contract, but that immediately or at any time after the council had made the contract, the board of public service at its will might alter the contract to suit itself. We think that is not the meaning of the statute, and we think the statute uses the terms ''make'' and ''execute'' in such manner as to fairly distinguish them and to indicate that the board of public service is to do both.    Section 144 provides: ''All contracts *made* by the directors of public service shall be *executed* by them in the name of the city,'' etc.

Notwithstanding the general and sweeping provisions found in Section 127 to the effect that ''all powers conferred by this act upon municipal corporations shall be exercised by council, unless otherwise provided herein,'' which evidently gives executive or administrative authority to the council where it is not conferred upon some other body, we think the power in this instance is conferred upon the board of public service and may be exercised by it; so that in entering into this contract we think the proceedings are regular so far as the exercise of power was concerned; that it was properly doné, by the proper board or tribunal; and as to the matter of plans and· specifications, we think that is also executive or administrative and was performed by the proper officers. *Wayman* v. *Southard,* 10 Wheat. (U. S.), 1, 42; *State* v. *Messenger,* 63 O. S., 398; *Railroad* v. *Commissioners,* 1 O. S., 77; *State* v. *Commissioners,* 54 O. S., 333; *Territory, ex rel,* v. *Scott,* 3 Dak., 357.

The second general charge, which is quite comprehensive, ·is stated in various forms in the pleadings, and is in substance

that the requirements of law as to competitive bidding were not and could not be observed, because such plans as gave a common basis for bids, were not prepared and adopted.

There is no provision in the Municipal Code requiring plans and specifications to be prepared for bidders, or as a basis for bids upon work of this character. No doubt it is very proper practice—perhaps, in some instances, a necessary formality—we are not prepared to say it may be dispensed with in all cases; nor are we prepared to say that it is required in all cases. Certainly there is no statutory requirement for it. The theory and contention of council for plaintiff, and for the city, is that such plans and specifications are necessary, in the nature of things, whenever there must be competitive bidding so that there may be a common basis upon which the bids may be formulated and submitted; that all who undertake to bid should know precisely what they are to do or to furnish, and that without this provision and preparation there could be, in the nature of things, no competitive bidding. We are cited to a large number of authorities in support of this proposition, but, in all cases, so far as we have observed, the statute under consideration provided that the contract should be let to the "*lowest* bidder," or to the "*lowest responsible* bidder," or words of like import. And, as is said in *Packard* v. *Hayes,* 94 Maryland, 233, and many other cases, where the law under consideration required the letting to be done to the "lowest," or the "lowest responsible bidder," this must be done in order that the awarding body may be able to accomplish its function, which is simply to make a mathematical computation and ascertain which is the lowest bidder, or, if the lowest responsible bidder is required, to determine the responsibility of the party, and then enter upon such mathematical computation. The statute under consideration here—Section 143—provides that the board of public service shall make a written contract with the "*lowest* and *best* bidder," and further provides that the board may reject any and all bids. We think this permits the board to take into consideration more than the price and more than the character of the bidder; we think it allows the consideration of three elements at least, and that the competition provided for in this statute

is in three lines, at least.   The awarding tribunal may consider—

1st.   The quality of the thing, the feasibility of the plan, the efficiency of the thing that is to be furnished, etc.

2d.   The quality of the bidder, his qualifications, responsibility, etc.

3d.   The price, in view of the other considerations.

So that in determining which is the "lowest and best" bidder, the board in its discretion determines, substantially, which is the best proposition, all things considered.   This is a wide departure from the law requiring the letting to the lowest bidder; and it would be interesting to trace the history of the changes in the laws of Ohio upon that subject and the holdings thereunder, though perhaps not profitable now, and we state our conclusions only.   It may be said that the law thus construed opens the way for what is commonly called "graft," or the perpetration of frauds upon the municipality; for the exercise of favoritism which would be inimical to the interests of the people; but we are bound to say that it seems to us that there are as great opportunities for these methods of fraud under the old system, which required the letting to the lowest bidder, as there can be under a system which allows municipal bodies in considering bids to take advantage for its benefit of everything, that a private person might take advantage of that would be for his benefit.   It permits the public to get the best and (though it may not be the lowest in price) it may be the cheapest in the long run.   It does not require it to accept the lowest price even though based upon plans, workmanship or materials of inferior kind and quality.   That being true, it follows, we think, that the plans and specifications required in order that the bidding may be competitive, need not go into the details · that would be required if there were nothing left for the awarding body to do but to make a computation.   It is not necessary, in other words, for the bidders to .compete or bid upon precisely the same thing as in cases where price alone is to govern the award.

These general plans that I have mentioned—I need not undertake to describe them—were approved by the council, approved by the State Board of Public Health and approved by the board of public service.   But these plans were

not all that was furnished to the bidders; in addition to the plans for the work and materials to be furnished and performed under each of the several contracts, running from one to eight, specifications were prepared which were published in pamphlet form, together with the advertisement, proposal and contract, and these specifications seem to us to set forth with great particularity what was required of the bidders. This contract No. 4, for instance, was divided into some forty-four separate items, and those items were subdivided in many cases. The specifications seem to enter into the details with very great particularity. Mr. Consaul was called as a witness, and he says, as to certain of these items, running from No. 29 to No. 37, inclusive, that there are no plans furnished, that is to say, no drafts, or sketches, but he does not say that there are no specifications. It appears that as to these items there are no special plans, using the word "plans" in the sense of sketches—but the things are provided for by the specifications; and Mr. Parmalee, testifying on behalf of the defendant, says that, that the general plans, taken in connection with the specifications, are so clear and specific that any person competent to do that work, or to supervise the doing of the work, might understand readily what was required under this proposal. As to certain details, the board of public service required the bidders to furnish their own sketches or plans.

It also appears from the evidence that the parts not detailed, but only described in the specifications—being the parts for which bidders were to furnish detailed plans—were well described in the specifications so that persons competent to bid knew exactly what was required, and that the parts and things actually bid upon by the various persons were intended to perform exactly the same work and differed only in appearance. In other words the specifications permitted the use of well known standard apparatus kept in stock or manufactured by different concerns in the United States. It seems to us that this method broadened the field of competition and that to have adopted any particular part or thing would have tended to suppress competition. It appears in evidence that in the United States there are about nine institutions that are capable of constructing works of this character. Of those nine, seven bid

upon this work. That would indicate that there was competition and it does not appear to us from the testimony of any witness, or otherwise, that the bidders found any difficulty in ascertaining what they were to bid upon or that prices were excessive; and in making their bids they took the matter up, as they were required to do by the method of submission, and bid upon the items item by item; and assuming that definite plans were required, it is said:

"The test to be applied in determining the meaning of plans and specifications in connection with public bidding is the meaning derived therefrom by bidders and contractors familiar with the language employed" (*State* v. *Abbot*, 2 C. C.—N. S., 281).

And we think that is a fair rule for testing the matter. If it were submitted to a person unskilled in such matters, he would probably be unable to ascertain from these plans and specifications what is required. But the undisputed testimony is, that persons competent to furnish these materials and to do this work, or to oversee it, could readily understand what was required of them by these plans and specifications. As I have said, the plans admit of some deviation in the form of construction and in the class of materials to be furnished, but that, we think, is admissible under the provision that the lowest and best bidder is to be awarded the contract. That, we think, is necessary. There are many reasons why this should be so, which I shall not discuss now for the reason that, following this opinion, Judge Wildman will deliver an opinion in a case (*Holbrook* v. *City*, *post*), that involves this question of the scope of discretion, variation from any definite plan, etc., that may be allowed under the provision that the lowest and best bidder shall be awarded the contract. I expect him to discuss the matter fully, and, therefore, I shall say no more about it except to refer to the case of *Ampt* v. *Cincinnati*, 17 Cir. Ct. Rep., 516; s. c. 6 N. P., 208, a case which was affirmed by the Supreme Court, where there is a discussion of the subject that we think quite pertinent to certain phases of the case at bar; and also to the case of *Ohio, ex rel Bryce Furnace Co.*, v. *Board of Education*, in the 14th Cir.

Ct. Rep., p. 15, opinion by Judge King formerly of this court, where there is some discussion of the matter. See also *State* v. *St. Bernard*, 10 Cir. Ct. Rep., 74; *Coppin* v. *Herman*, 6 N. P., 452; 7 N. P., 529, affirmed 63 O. S., 440.

The system that the board of public service evidently contemplated adopting ultimately, unless bids should develop that it would be more expedient to adopt another, was the American system; but to get all the light and advantage that might be gained thereby, bids were invited on all other systems. It has been suggested that some of the plans and specifications adopted by the board of public service were sufficiently definite for competitive bidding on the American system, but they were not so for other systems; but since the proceedings respecting such other systems were of a merely experimental character, and no bids thereon were made, we do not regard this alleged incompleteness of plans as at all material. All that has been said and done respecting other systems may properly be regarded as surplusage or a work of supererogation.

There is one more very important consideration urged upon our attention, and that is, that if the city should enter into details, reducing everything to the last analysis, providing exactly how everything should be done, it could not avail itself of the guaranty of efficiency—in other words, some lee-way must be allowed to the contractor furnishing a work of this character, who is required to guarantee the efficiency of the plant—his guaranty would be all but worthless and nugatory if the plans were the plans of the city down to the very lowest detail, instead of being somewhat his own plans, and the authorities cited to support that proposition.

*McKnight Stone Co.* v. *Mayor*, 160 N. Y., 72; *Filbert* v. *Philadelphia*, 181 Pa. St., 530; *McRitchie* v. *Lake View*, 30 Ill. App., 393.

When the construction consists of the mere assembling and putting in place of parts of standard machinery, or the ordinary construction of edifices or works made of brick and mortar, wood, cement, and the like, the making of complete plans may be expedient and legally necessary; but we are not prepared to

say that it is either required by the law or expedient where, in a case like this, much depends upon adjustment of means to ends in the perfection of the system so as to make it work well, and where efficiency is the great desideratum, and where an enforceable guaranty thereof may be essential to save the city from fruitless expense of great magnitude.

The third objection urged is, that there is a non-compliance with Section 794 of the Revised Statutes, a section applying to boards and tribunals generally that have the awarding of public contracts, and which is retained by Section 143 of the Municipal Code and made applicable to municipal contracts, to-wit: "The provisions of Section 794 of the Revised Statutes of Ohio, so far as the same may apply, shall remain in full force and effect."

The proposal was submitted in such a way as to require the separate bids provided for by Section 794, and separate bids were received, but we are unable to find, and counsel for the plaintiff and the city failed to point out to us an aggregation of separate bids covering the whole work to be performed and the whole of the materials to be furnished, i. e., covering the whole contract—that is less in amount than the bid of the Norwood Engineering Company. It devolves upon the parties complaining here to show that such bids were submitted and in such form that the board not only might waive defects and technicalities and accept the same, but that the board was required to accept them. And, furthermore, the element of "best bid," as well as that of "lowest bid" enters into this matter by virtue of Section 143, and in so far as Section 143 is inconsistent with Section 794, we have no doubt but Section 143 controls, and that it devolves upon the parties complaining to not only show that this aggregation of bids would amount to the lowest in price, but that in other respects it was the best bid. Waiving that point, however, we say that considering only the question of lowness of price, we fail to discover any aggregation of bids that would meet that requirement. Our attention is called to the bid of Mr. Burgard upon certain items taken in connection with the bid of the Norwood Engi-

neering Company upon certain other items, but that is not permissable, for the reason that the Norwood Engineering Company put in its bid as a whole—a thing it had a perfect right to do—and it can not be required to construct a part at a certain price where it has conditioned its bids upon certain items upon the acceptance of the whole bid.

The fourth objection urged is, that there is an abuse of power because but $565,000 has been appropriated, and the council has limited the expenditure for completion of the whole system planned to that amount. And in this connection it is argued that the council was bound, under the circumstances, to place a limitation upon the amount to be expended in completing the whole system planned. We are cited to no law in support of this contention that the council was bound to thus fix the limitation, and we do not know of any. We do not know why the council may not plan a public improvement that may or will require the expenditure of more money than it has on hand to appropriate for the purpose, and why it may not for the carrying forward of a public improvement from time to time as it is able appropriate moneys for that purpose, the contracts, of course, at no time to exceed—and they would not be valid if they did exceed—the amount appropriated for them, and that is certified by the auditor to be on hand when required. We mentioned during the argument by way of illustration, and we still think it a fair one, the matter of the planning of the boulevards for the city of Toledo. We understand that such a system is planned to encircle the city, or a part of it. We do not know why the city may not plan such a thing; why it may not provide all the plans and specifications and details for it; why it may not declare its purpose to build it, to condemn the necessary real estate and to improve it by grading, paving, setting out trees, etc., although it may not have on hand at the time the money to do this work, and why it may not then from time to time as it has the funds with which to proceed, carry forward the work, taking up, for instance,  a mile this year and two miles the next, or why it may not proceed in the same way with respect to a public building, or why it may not proceed in the same way in respect to just such an improvement

as this; and we know of nothing which would afford a better illustration than water works for the city. For instance, if this city were totally without water works, might it not say "We will plan for water works for this city for its present needs and for its probable future needs," and, thereupon devise plans which would be sufficient for a city of three or four hundred thousand inhabitants, and complete plans and specifications therefor, declare its purpose to build it, and then appropriate such money as might be available for the completion of such parts of the system as it might think best to first complete. This, we think, is within the power and the discretion of the council. Of course, such plans might be defeated by the subsequent action of the council or by another council, because one council can not bind its successors, and the whole plan might be overturned in so far as its overturning would not interfere with contracts lawfully entered into or other vested rights.

But did the council as a matter of fact in this case limit the expenditure to $565,000? That depends upon the construction of this ordinance of May 8, 1905. To determine the actual limitation we must look to the legislation in the light of commonly known surroundings and circumstances touching the subject-matter. All evidence of what was said in council by the different members and by the city solicitor was excluded—that is to say, there was an offer to prove it but we did not admit it, because upon this matter the council was acting as a legislative body and we thought it would be no more proper than the admission of like matters pertaining to like action by the State Legislature. This report of the engineering commission was shown upon the trial to have been in the hands of all the councilmen and laid upon their desks and examined by them, at least, before the passage of this ordinance of May 8, 1905. We received that testimony under objection and announced that we would rule upon it later. We conclude now that it ought to have been excluded; we think that should stand upon the same footing as the debates and oral representations in the council. It will be excluded, and an exception for the Norwood Engineering Company and of A. Bentley & Son will be noted.

The circumstance of the time required to finish up the work provided for by contract No. 4, we think must be presumed to have been known to the council, and it is made apparent by the evidence that a part of this work would require substantially two years in its performance. As I have stated, it was conceded upon the hearing that the whole work planned under the plans approved by the council would cost not less than $765,000, and this we think it may be fairly assumed was known to the council. We do not think we have any right to assume that the council was composed of a lot of ignoramuses or of men who would not make any investigation of the matter upon which they were legislating. There was some testimony tending to show that upon the basis of these alleged lowest bids, that is to say, the aggregation of separate bids upon various items, the extension might have been finished to a capacity of twenty million gallons per day within the limit of $565,000, but we are unable to find bids as thus claimed. But the council does not appear to have planned or resolved upon anything of that kind; it planned for a system some parts of which were adequate for taking care of sixty millions of gallons per day. As to a part of the system, only so much as would take care of twenty millions of gallons per day was to be constructed at once, and we must assume that the council in fixing that limitation or in the adopting of this legislation, had under consideration the plans which they had approved, the projects which they were forwarding, and not something which might have been done contrary thereto, and, therefore, we think that they should be held to have considered, adopted, promoted and intended the construction of a plant which they knew, and which everybody looking into the matter must have known, would cost more than $565,000, and their legislation upon the subject should be read in the light of that important fact.

But we think that without this side light—without this aid—taking the legislation as it reads, it does not place a restriction of $565,000 upon the cost of the whole finished extension. Perhaps that is enough to be said upon this subject, but I will call attention to a few paragraphs of the ordiance that bring us to this conclusion. The council unquestionably authorized the construction of the whole extension planned. I have already

read the title of the ordinance. The limitation of $565,000, we think, was placed upon the contracts that the board of public service was authorized by the council to enter into in the carrying forward of the enterprise. A reading and study of the ordinance brings us to the conclusion that what the council provided in the way of limitation is that which was required by law, to-wit, that the board of public service should not enter into contracts exceeding in amount for their payment the sum of $565,000 appropriated. It must be conceded by all that nowhere does it state in the course of any of this legislation, that the whole cost of the entire improvement planned shall not exceed $565,000. And we think that in construing this legislation, we should not only give the council credit for intelligence, but with the purpose of not doing an idle and foolish thing, and with purposing to accomplish that which they declared they desired to accomplish.

Now in this ordinance "Declaring the necessity for extending, enlarging and improving the present water works system of the city of Toledo and equipping and furnishing such extension and to secure a more complete enjoyment of the same by supplying pure and clear water to the city and the inhabitants thereof and authorizing a contract for the construction of certain parts thereof," the clause which has provoked the most discussion and which both sides rely upon as establishing their respective contentions is this:

"The board of public service may advertise for bids and let contracts for such part or parts of said water works extension at such times and in such order as to said board shall be deemed for the best interest of the city in securing a first-class, good and economical construction, provided that contracts shall not be let for said water works extension, which in the aggregate amounts to more than five hundred and sixty-five thousand dollars, which sum is now available in the treasury and which is hereby appropriated to meet such cost and expense from the money heretofore realized from the sale of bonds for the purpose and from the funds heretofore received as charges for water in the department of public service."

It will be noticed that the word "contracts" is in the plural. This section very clearly contemplates that this work is to go forward, not under a single contract, necessarily, but under

contracts.    We have observed how it was divided up into con-
tracts.    This seems to have been a systematic and philosophical
mode of division, the best thing for all concerned to accom-
plish the purpose in the best way.    The council, evidently, had
something of that sort in mind; evidently knew that the whole
could not be constructed during a year and perhaps not during
two years; that $565,000 would be sufficient with which to go
forward with so much of the construction as could be accom-
plished within a year or two years.    Therefore, they provided
for that much, they appropriated that much and declared, as
we read the ordinance, that the aggregate amount of the con-
tracts to be let in the carrying forward of this enterprise
was not to exceed $565,000.    It is not claimed here that con-
tracts were let in excess of $565,000.    The theory of the parties
undertaking to defeat the carrying out of the contract is that
because it will require more than $565,000 to finish the proposed
extension upon the basis of the price at which the contract
with the Norwood Engineering Company has been let, therefore
that contract is invalid and nugatory, even though no appropria-
tion had been exceeded in the making of it; that to use so large
a proportion of this fund in the accomplishing of a part of
the work when the remainder of the fund would not be suffi-
cient to finish the work, is such an abuse of corporate power
that it must have been known and should have been known to
the contracting party—the party contracting with the city—and
that that party is affected by it.    Well, this may be a correct
theory.    We are not required to say.    We are cited to authorities
some of which seem to sustain the idea and some of which
seem to us not to sustain it, but we decide this case upon the
conclusion that I have already stated—that the ordinance does
not attempt to limit to $565,000 the cost of the construction
of the entire improvement contemplated.

It is argued that the third paragraph of the second section
of the ordinance of May 8, 1905, providing that certain payments
shall not be made until satisfactory tests of the plan or system
or plant shall have been made, evinces a purpose to have the
whole extension planned constructed and completed at one time.

Undoubtedly it was the purpose to have all the extension that
was planned constructed with all convenient speed, to the end

that the pure water supply sought might be available to the people of the city. But it is apparent that this could not be well done in less than two or three years, before the expiration of which time other funds might be made available to do the work that would necessarily and properly be postponed until it would become useful. Whether a contractor for a part to be constructed the first year must wait for his pay, or a part of his pay, until the finishing of the plant a year or two years later, may well be doubted. If his part of the work could be tested before the completion of the whole extension it would certainly be imposing upon him a great hardship without adequate cause, to make such requirement. We think that was not contemplated. There is nothing in the evidence to warrant the inference or conclusion that perfect and satisfactory tests of parts could not be made until the completion of the whole. But even if this waiting for the final payment, or part payment, until the completing and testing of the whole was contemplated and is provided for, that does not, in our opinion, weaken the argument in support of the contention that for the construction of the parts that would be constructed last, the providing of other funds was contemplated.

This disposes of all the points as I now recall them, that are urged against this contract. It appears to us that the steps have been regular and orderly, and we are glad to know and are glad to be able to say that it is not claimed or shown on behalf of anybody that there has been any fraud or overreaching or moral wrong in any way; or that the contract price is excessive or unreasonable, but that what is depended upon here to defeat this contract is simply informalities or irregularities in the steps pursued. We find none that should defeat the contract.

The judgment of the court is that the petition and cross-petition shall be dismissed and the costs go against the plaintiffs and the city.

*L. W. Morgan* and *A. T. Courley*, for the plaintiff.

*C. S. Northup*, for the City of Toledo.

*Marshall & Fraser, Smith & Baker* and *U. G. Denman*, for the defendants.